FILED

2024 Jun-25  PM 03:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

**LAKESHIA BALL,**
***As mother and next friend of***
***Kamiya M. Ball et al.,***
      Plaintiffs,

**v.**
                    **Case No. 1:24-cv-543-CLM**

**TALLADEGA COUNTY**
**SCHOOL SYSTEM *et al.*,**
      Defendants.

## MEMORANDUM OPINION

On April 2, 2024, the Talladega County Board of Education ("the Board") voted to close Talladega County Central High School ("TCCHS"). Five parents of students who either attend or wish to attend TCCHS have asked this court to enjoin the closure. The court held a hearing where the parties presented evidence for and against the Parents' motion for preliminary injunction. For the reasons stated below, the court **DENIES** the Parents' motion. (Docs. 2, 3).

## BACKGROUND

The court starts with a general background on the school and the actions that led to this lawsuit.

### I.    Talladega County Central High School ("TCCHS")

<u>Declining student enrollment</u>: TCCHS is one of several schools in the Talladega County School System. TCCHS's student population has gradually declined for the last 20 years:



(Doc. 16-24, p. 5).

TCCHS currently has the lowest student population of any other school in the county:

| School | Enrollment (2023-2024 School Year) |
|---|---|
| Talladega County Central High School | 140 |
| Childersburg High School | 343 |
| Childersburg Middle School | 269 |
| Lincoln High School | 560 |
| Charles R. Drew Middle School | 451 |
| Munford High School | 384 |
| Munford Middle School | 275 |
| Winterboro High School | 304 |

(Doc. 16-3, pp. 3-10). Only 17 students were in the graduating class in 2022, 18 students in 2023, and 14 students were projected for the graduating class of 2024:

## Student Data Summary - Last Enrollment

| SYSTEM SELECTION | | |
| --- | --- | --- |
| School Year | 2022; 2021 - 2022 | |
| School System | 061; Talladega County | |
| School | 0060; Talladega County Central High | |

| STUDENTS RACE / ETHNIC | | |
| --- | --- | --- |
| American Indian/Alaska Native | 1 | 0.80% |
| Asian | 0 | 0% |
| Black | 114 | 91.20% |
| Native Hawaiian/Pacific Islander | 0 | 0% |
| White | 10 | 8.00% |
| Two or more races | 0 | 0% |
| Other races | 0 | 0% |
| Not Specified | 0 | 0% |
| TOTAL | 125 | |
| Hispanic/Latino | 1 | 0.80% |

| STUDENTS GENDER | | |
| --- | --- | --- |
| Female | 64 | 51.20% |
| Male | 61 | 48.80% |
| Other | 0 | 0% |
| TOTAL | 125 | |

| STUDENTS STATUS | | |
| --- | --- | --- |
| EL (EL = 1, 2 & 6) | 1 | 0.80% |
| Homeless | 0 | 0% |
| Target Assistance | 0 | 0% |
| Schoolwide | 125 | 100% |
| Migrant | 0 | 0% |
| Immigrant | 0 | 0% |
| Foreign Exchange | 0 | 0% |
| 21st Century | 0 | 0% |
| Foster | 0 | 0% |
| Military Affiliated | 4 | 3.20% |
| Total Exceptionality | 19 | 15.20% |
| Spec Ed | 16 | 12.80% |
| Gifted Primary | 3 | 2.40% |
| Gifted Secondary | 0 | 0% |
| Enrichment | 0 | 0% |
| Poverty | 114 | 91.20% |
| Lunch - Free | 104 | 83.20% |
| Lunch - Reduced | 6 | 4.80% |
| Lunch - Paid | 15 | 12.00% |
| Lunch - DC | 60 | 48.00% |
| Athlete | 97 | 77.60% |
| Career Tech | 94 | 75.20% |

| Choose fields | Export to XLS | Export |
| --- | --- | --- |

| Grade | Enrolled | Grad |
| --- | --- | --- |
| Ages 0 to 2 (97) | | |
| Ages 3 to 5 (98, 99) | | |
| Grade K (00) | | |
| Grade 1 (01) | | |
| Grade 2 (02) | | |
| Grade 3 (03) | | |
| Grade 4 (04) | | |
| Grade 5 (05) | | |
| Grade 6 (06) | | |
| Grade 7 (07) | 26 | 0 |
| Grade 8 (08) | 25 | 0 |
| Grade 9 (09) | 25 | 0 |
| Grade 10 (10) | 16 | 0 |
| Grade 11 (11) | 16 | 0 |
| Grade 12 (12) | 17 | 17 |
| Grade 13 (13) | | |
| Grade 14 (14) | | |
| Grade 15 (15) | | |
| | 125 | 17 |

## Student Data Summary - Last Enrollment

| SYSTEM SELECTION | | |
| --- | --- | --- |
| School Year | 2023; 2022 - 2023 | |
| School System | 061; Talladega County | |
| School | 0060; Talladega County Central High | |

| STUDENTS RACE / ETHNIC | | |
| --- | --- | --- |
| American Indian/Alaska Native | 1 | 0.81% |
| Asian | 0 | 0% |
| Black | 113 | 91.87% |
| Native Hawaiian/Pacific Islander | 0 | 0% |
| White | 9 | 7.32% |
| Two or more races | 0 | 0% |
| Other races | 0 | 0% |
| Not Specified | 0 | 0% |
| TOTAL | 123 | |
| Hispanic/Latino | 1 | 0.81% |

| STUDENTS GENDER | | |
| --- | --- | --- |
| Female | 65 | 52.85% |
| Male | 58 | 47.15% |
| Other | 0 | 0% |
| TOTAL | 123 | |

| STUDENTS STATUS | | |
| --- | --- | --- |
| EL (EL = 1, 2 & 6) | 1 | 0.81% |
| Homeless | 0 | 0% |
| Target Assistance | 0 | 0% |
| Schoolwide | 123 | 100% |
| Migrant | 0 | 0% |
| Immigrant | 0 | 0% |
| Foreign Exchange | 0 | 0% |
| 21st Century | 0 | 0% |
| Foster | 0 | 0% |
| Military Affiliated | 3 | 2.44% |
| Total Exceptionality | 20 | 16.26% |
| Spec Ed | 16 | 13.01% |
| Gifted Primary | 4 | 3.25% |
| Gifted Secondary | 0 | 0% |
| Enrichment | 0 | 0% |
| Poverty | 119 | 96.75% |
| Lunch - Free | 110 | 89.43% |
| Lunch - Reduced | 9 | 7.32% |
| Lunch - Paid | 4 | 3.25% |
| Lunch - DC | 93 | 75.61% |
| Athlete | 96 | 78.05% |
| Career Tech | 85 | 69.11% |

| Choose fields | Export to XLS | Export |
| --- | --- | --- |

| Grade | Enrolled | Grad |
| --- | --- | --- |
| Ages 0 to 2 (97) | | |
| Ages 3 to 5 (98, 99) | | |
| Grade K (00) | | |
| Grade 1 (01) | | |
| Grade 2 (02) | | |
| Grade 3 (03) | | |
| Grade 4 (04) | | |
| Grade 5 (05) | | |
| Grade 6 (06) | | |
| Grade 7 (07) | 19 | 0 |
| Grade 8 (08) | 26 | 0 |
| Grade 9 (09) | 24 | 0 |
| Grade 10 (10) | 23 | 0 |
| Grade 11 (11) | 13 | 0 |
| Grade 12 (12) | 18 | 18 |
| Grade 13 (13) | | |
| Grade 14 (14) | | |
| Grade 15 (15) | | |
| | 123 | 18 |

**Student Data Summary - Last Enrollment**

| SYSTEM SELECTION | | |
|---|---|---|
| School Year | 2024; 2023 - 2024 | |
| School System | 061; Talladega County | |
| School | 0060; Talladega County Central High | |

| STUDENTS RACE / ETHNIC | | |
|---|---|---|
| American Indian/Alaska Native | 1 | 0.71% |
| Asian | 0 | 0% |
| Black | 127 | 90.07% |
| Native Hawaiian/Pacific Islander | 0 | 0% |
| White | 12 | 8.51% |
| Two or more races | 1 | 0.71% |
| Other races | 0 | 0% |
| Not Specified | 0 | 0% |
| TOTAL | 141 | |
| Hispanic/Latino | 1 | 0.71% |

| STUDENTS GENDER | | |
|---|---|---|
| Female | 63 | 44.68% |
| Male | 78 | 55.32% |
| Other | 0 | 0% |
| TOTAL | 141 | |

| STUDENTS STATUS | | |
|---|---|---|
| EL (EL = 1, 2 & 6) | 0 | 0% |
| Homeless | 0 | 0% |
| Target Assistance | 0 | 0% |
| Schoolwide | 141 | 100% |
| Migrant | 0 | 0% |
| Immigrant | 0 | 0% |
| Foreign Exchange | 0 | 0% |
| 21st Century | 0 | 0% |
| Foster | 1 | 0.71% |
| Military Affiliated | 3 | 2.13% |
| Total Exceptionality | 28 | 19.86% |
| Spec Ed | 23 | 16.31% |
| Gifted Primary | 5 | 3.55% |
| Gifted Secondary | 0 | 0% |
| Enrichment | 0 | 0% |
| Poverty | 108 | 76.60% |
| Lunch - Free | 103 | 73.05% |
| Lunch - Reduced | 5 | 3.55% |
| Lunch - Paid | 33 | 23.40% |
| Lunch - DC | 103 | 73.05% |
| Athlete | 108 | 76.60% |
| Career Tech | 97 | 68.79% |

| Choose fields | Export to XLS | Export |
|---|---|---|
| **Grade** | **Enrolled** | **Grad** |
| Ages 0 to 2 (97) | | |
| Ages 3 to 5 (98, 99) | | |
| Grade K (00) | | |
| Grade 1 (01) | | |
| Grade 2 (02) | | |
| Grade 3 (03) | | |
| Grade 4 (04) | | |
| Grade 5 (05) | | |
| Grade 6 (06) | | |
| Grade 7 (07) | 27 | 0 |
| Grade 8 (08) | 21 | 0 |
| Grade 9 (09) | 30 | 0 |
| Grade 10 (10) | 25 | 0 |
| Grade 11 (11) | 24 | 0 |
| Grade 12 (12) | 14 | 0 |
| Grade 13 (13) | | |
| Grade 14 (14) | | |
| Grade 15 (15) | | |
| | 141 | 0 |

(Doc. 16-2, pp. 1-2).

TCCHS's declining student population results in two consequences relevant here: (1) state accountability requirements, and (2) an increased cost to the Board to fund TCCHS.

State accountability requirements: TCCHS operates under the Alabama Accountability Act of 2015 ("AAA") (Act No. 2015-434). The AAA evaluates schools and assigns them a letter grade based on several factors including academic achievement, academic growth, chronic absenteeism, college and career readiness, graduation rates, and progress of English language proficiency. (Doc. 16-22, p. 5). Based on these factors, the Alabama State Department of Education ("ALSDE") released school report cards for every school in Alabama on December 14, 2023. (Doc. 16-14, p. 1). TCCHS received a "D" ranking on its report card.

But that "D" grade did not stem from poor performance. To the contrary, TCCHS showed college and career readiness and had graduation rates above 90 percent. But TCCHS received no credit for its

achievement because schools must have 20 students in a subgroup to get credit for these categories. Because TCCHS had only 17 students in its 2022 graduating class, it received zero points in these categories. So despite TCCHS's high performance that otherwise would have placed it closer to receiving a "B," it received a "D."

Receiving a "D" grade has consequences. Schools earning a "D" or "F" on their state report card are labeled "Priority Schools." Priority Schools are required to offer "school choice" for the upcoming academic year—meaning TCCHS is now legally required to give students the option to leave TCCHS and attend another school in the county. In other words, TCCHS's low student population caused TCCHS to receive a grade that would cause its student population to fall even further.

And, at least for three years, the fall is unavoidable. TCCHS is projected to remain a Priority School through 2027 based on enrollment numbers for 2022, 2023, and 2024:[1]

**Talladega County Central High School**
**Cohort/Graduate Projections**

| Report Card Date | Graduation Cohort | School Choice Year |
|---|---|---|
| Nov. 2023 | Class of 2022 (17 students) | 2024-2025 |
| Nov. 2024 | Class of 2023 (18 students) | 2025-2026 |
| Nov. 2025 | Class of 2024 (14 students) | 2026-2027 |

(Doc. 16-2, pp. 1-5). So TCCHS would have to offer school choice for the next three academic years, at least. The students' choice to leave would perpetuate the cycle: Lower enrollment would lead to a lower AAA report card grade that would lead to lower enrollment—and so on.

---

[1] School choice years are calculated three years in advance. So because the graduating class of 2022 was fewer than 20 students, the graduating class of 2025 faced school choice requirements. Because the graduating classes of 2023 and 2024 were also projected to be fewer than 20 students, the graduating classes of 2026 and 2027 would also face school choice requirements.

Excessive financial burden: The second consequence of TCCHS's declining student population is an increased cost to the Board to fund TCCHS. Talladega County Deputy Superintendent Vicky Ozment and Superintendent Suzanne Lacey testified about how declining enrollment impacts the costs required to keep the school open. According to Ozment and Lacey, the number of students at a school determines the number of teachers the ALSDE assigns (and funds) for a school. So when student population decreases, so does the number of teachers the ALSDE pays to teach at that school. (Doc. 16-22, p. 15). Because of this, to keep TCCHS open with the number of teachers necessary to teach required courses, the Board must supplement the cost to assign teachers to TCCHS. This means the Board must spend more money to operate TCCHS than any other school in the county. And the numbers aren't close:

**Talladega County Board of Education**
**Per-Pupil Expenditures**

| School | Per-Pupil Expenditures | | | | |
|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 |
| B.B. Comer Elementary | $7,962 | $7,864 | $9,494 | $10,311 | $10,403 |
| B.B. Comer High | $12,170 | $12,542 | $15,384 | $15,200 | $15,652 |
| Childersburg Elementary | $11,694 | $10,604 | $12,660 | $11,976 | $13,670 |
| Childersburg High | $11,390 | $11,071 | $12,508 | $13,525 | $13,318 |
| Childersburg Middle | $7,094 | $8,218 | $8,822 | $9,998 | $10,673 |
| Drew Middle | $7,557 | $7,065 | $7,099 | $7,474 | $8,320 |
| Fayetteville High | $9,158 | $9,555 | $10,831 | $11,187 | $11,922 |
| Lincoln Elementary | $8,515 | $8,963 | $10,071 | $9,725 | $10,239 |
| Lincoln High | $10,014 | $10,248 | $10,643 | $11,862 | $12,156 |
| Munford Elementary | $9,745 | $10,370 | $10,621 | $11,501 | $12,499 |
| Munford High | $9,933 | $10,363 | $10,938 | $12,563 | $13,595 |
| Munford Middle | $7,438 | $7,478 | $8,192 | $10,000 | $9,669 |
| Stemley Road Elementary | $10,680 | $10,156 | $12,735 | $12,964 | $13,377 |
| Sycamore Elementary | $10,429 | $13,259 | $11,871 | $12,341 | $12,731 |
| Talladega County Central High | $18,735 | $17,057 | $18,727 | $26,463 | $22,321 |
| Watwood Elementary | $11,091 | $11,865 | $12,833 | $13,576 | $13,606 |
| Winterboro High | $13,197 | $12,223 | $12,083 | $11,791 | $11,906 |
| Average System Total | $9,806 | $9,984 | $10,943 | $11,641 | $12,066 |

**FY 2024 Talladega County Schools Unit Breakdown/Additional Costs**

| School Name | (Over) / Under Teacher Units | Local/ Federal Funding | % of Additional Funding | Validated Local/Federal Funding | % of Additional Funding | % of Total Students |
|---|---|---|---|---|---|---|
| Watwood Elementary | (1.78) | $ 149,405.20 | 6.92% | $ 149,716.53 | 6.55% | 3.24% |
| BB Comer High | (1.34) | $ 100,071.29 | 4.64% | $ 116,468.38 | 5.10% | 5.69% |
| BB Comer Elementary | (1.79) | $ 179,105.83 | 8.30% | $ 190,903.82 | 8.36% | 6.57% |
| Drew Middle | (0.50) | $ 61,163.19 | 2.83% | $ 61,178.72 | 2.68% | 6.98% |
| Childersburg Elementary | (1.65) | $ 164,548.43 | 7.62% | $ 152,218.21 | 6.66% | 3.17% |
| Childersburg High | (0.73) | $ 65,295.97 | 3.03% | $ 69,600.90 | 3.05% | 5.19% |
| Childersburg Middle | (0.90) | $ 79,730.72 | 3.69% | $ 79,474.99 | 3.48% | 5.26% |
| Talladega County Central | (6.87) | $ 581,953.83 | 26.96% | $ 642,936.66 | 28.15% | 1.84% |
| Fayetteville High | (0.50) | $ 34,572.50 | 1.60% | $ 46,369.97 | 2.03% | 8.82% |
| Munford Elementary | (0.55) | $ 57,136.34 | 2.65% | $ 57,744.71 | 2.53% | 9.77% |
| Munford High | (0.50) | $ 57,554.86 | 2.67% | $ 57,554.86 | 2.52% | 6.06% |
| Munford Middle | (0.83) | $ 68,733.81 | 3.18% | $ 75,341.57 | 3.30% | 4.31% |
| Sycamore | (0.92) | $ 66,468.77 | 3.08% | $ 68,465.41 | 3.00% | 3.32% |
| Lincoln Elementary | (1.01) | $ 65,784.67 | 3.05% | $ 65,635.13 | 2.87% | 11.26% |
| Lincoln High | 0.36 | $ - | 0.00% | | 0.00% | 8.52% |
| Stemley Road Elementary | (3.83) | $ 298,009.01 | 13.81% | $ 298,801.14 | 13.08% | 4.72% |
| Winterboro High | (1.58) | $ 128,714.64 | 5.96% | $ 151,721.92 | 6.64% | 5.26% |
| **Totals:** | **-23.88** | **$ 2,158,249.06** | **$ 1.00** | **$ 2,284,132.92** | **$ 1.00** | |

(Doc. 16-1, pp. 1, 4). On top of this disparity, testimony disclosed that federal funding for the added teacher units will expire in September 2024.

Considering these three large factors—historical declining student enrollment, state accountability requirements, and the excessive financial burden—Superintendent Lacey recommended that the Board close TCCHS. The Board accepted her recommendation and voted 4-1 to close TCCHS. (Doc. 16-12, p. 3) (April 2, 2024 board meeting minutes).

—

Much of the Parents' consternation with the Board's April 2nd decision is *how* the Board got there. So the court next gives a general timeline of events, beginning with TCCHS receiving a "D" ranking on its report card and ending with letters to parents and students following the Board's vote to close TCCHS.

## II.   Timeline of Defendants' public communication related to TCCHS closing (December 2023 – April 2024)

Beginning in December 2023, the Board began sending notices to parents, informing them of the required school choice options, opportunities to visit school choice schools in the county, and meetings for public comment. These notices continued through April 2024:

| December 14, 2023 | Notice to parents of "D" ranking and school choice requirement for 2024-2025 academic year (Doc. 16-14) |
|---|---|
| January 22, 2024 | Meeting at TCCHS to inform parents of school choice process (Doc. 16-22) |
| January 30, 2024 | Deadline for parents to inform TCCHS principal if invoking school choice option (Doc. 16-14, p. 2). 11 students completed form. |
| January 31, 2024 | Notice to parents of meeting for public comment on TCCHS school choice (Doc. 16-15) |
| February 2, 2024 & February 7, 2024 | Invitations for parents and their students to visit another Talladega County school on the school choice list (Docs. 16-16, 16-17) |
| February 13, 2024 | Meeting for public comment on TCCHS school choice (*See* Doc. 16-15) |
| February 16, 2024 | Letter informing parents of: 8% of the student population indicating transfer to other schools, increasing challenge to keep TCCHS open including academic and financial burdens, and of March 5 meeting to "hear public comments regarding concerns related to the school's future" (Doc. 16-32) |

| February 23, 2024 | School visits for Talladega County school choice schools (*See* Docs. 16-16, 16-17) |
|---|---|
| February 24-25, 2024;<br><br>February 28, 2024;<br><br>March 2-3, 2024 | Announcements in *Daily Home* newspaper inviting public to provide comment on the future of TCCHS (Docs. 16-5, 16-6, 16-7) |
| March 1, 2024 | Second deadline for parents to submit school choice option (Doc. 16-32) |
| March 5, 2024 | Second meeting for public comment on TCCHS's future (Doc. 16-23) |
| April 2, 2024 | Called Board meeting. Lacey recommends closing TCCHS. Board votes 4-1 to close TCCHS (Doc. 16-12)<br><br>Letter to parents informing them of school's closing and information about student athletic eligibility after school transitions (Doc. 16-19)<br><br>Released press release on school closing to media |
| April 19, 2024 | Letter informing parents of school reassignment and athletic eligibility (Doc. 16-20) |
| May 3, 2024 | TCCHS Principal letter to students about ongoing support as they transition to new schools (Doc. 16-21) |

As shown by color change, one of the Parents' primary complaints was that neither the Board nor the Superintendent publicly mentioned closure as a result of the "D" grade before the April 2nd vote. So they were caught off guard by the Board's decision.

### III.   This lawsuit

The Parents sued the Talladega County School System and Superintendent Lacey, bringing four causes of action. The court previously attempted to interpret the Parents' claims from the complaint (*see* doc. 7), and restates those claims as interpreted (but slightly restructured) here:

- <u>42 U.S.C. § 1983 – Equal Protection</u>. Plaintiffs allege they have been deprived of their constitutionally protected liberty of school choice and that the Board (predominantly white) drew districting lines to interfere with the school (predominantly black) maintaining its necessary numbers to prevent "D" or "F" listing status.

- <u>42 U.S.C. § 1983 – Procedural Due Process</u>.
  - o Plaintiffs allege the Board did not hold a public hearing for the community to discuss TCCHS closing, which Plaintiffs allege was a violation of the Board's own internal processes.
  - o Plaintiffs allege the Board and Lacy intentionally deprived parents of Board procedure and that the Board must provide a process sufficient to remedy the violation of the Parents' right to school choice, a constitutionally protected right.

- <u>Alabama Open Meetings Act § 36-25A-3</u>. Plaintiffs allege that Lacey and the Board assured parents TCCHS would not be closed, then voted to close the school without parental presence or input. And that public notice of the school closure was not posted in time to allow parents to discuss the matter.

(Doc. 1, pp. 1-7, 23). The Parents' counsel confirmed at the hearing that these are indeed the Parents' claims.

The Parents also moved for a temporary restraining order, which the court denied. (Doc. 7). The court then construed the motion for temporary restraining order as a motion for preliminary injunction and held a hearing.

The Parents presented testimony from Plaintiff Katrina Burk, Plaintiff Erika Cole, and Pastor Jerry Jones, who has worked with TCCHS students for nearly 40 years. The School Defendants presented testimony from Superintendent Suzanne Lacey and Deputy Superintendent Vicky Ozment.

## STANDARD OF REVIEW

"To receive a preliminary injunction, the plaintiff must clearly establish the following requirements: '(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest.'" *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (citation omitted)). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)). Accordingly, "[f]ailure to show any of the four factors is fatal." *Id.*

## DISCUSSION

The court begins with the first element because "when a plaintiff fails to establish a substantial likelihood of success on the merits, a court does not need to even consider the remaining three prerequisites of a preliminary injunction." *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001) (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1342–47 (11th Cir. 1994) and *Cuban Am. Bar Ass'n, Inc. v. Christopher,* 43 F.3d 1412, 1424 (11th Cir. 1995)).

### A. Federal Claims

As shown below, the Parents have failed to show that they will likely succeed on any of their federal claims. The court starts with the federal claims against the school board members.

### i.  The School Board

<u>42 U.S.C. § 1983 – Equal Protection[2]</u>

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. art. XIV, § 1. Its "central purpose," though, "is the prevention of official conduct discriminating on the basis of race." *Red Door Asian Bistro v. City of Fort Lauderdale*, No. 22-11489, 2023 WL 5606088, at *6 (11th Cir. Aug. 30, 2023) (quoting *Washington v. Davis*, 426 U.S. 229, 239 (1976)). "To establish a violation of [] the Equal Protection Clause of the Fourteenth Amendment . . . [the plaintiff] must show that the [defendant's] decision or act had a discriminatory purpose and effect." *Cook v. Randolph Cnty., Ga.*, 573 F.3d 1143, 1152 (11th Cir. 2009) (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188 (11th Cir. 1999)).

The Parents first base their equal protection claim on alleged disparities in the opportunity to "opt-in" or "opt-out" of attending TCCHS. They argue that white students living within the school district zoned for TCCHS were allowed to opt out of attending TCCHS but that black students were not allowed to opt in, which led to the decrease in student enrollment numbers. The evidence shows that the Parents' belief was half correct: The Parents were right that no student—of any race—could opt in to TCCHS, but they were wrong that white students alone could opt out of TCCHS. Rather, students of any race could choose to move from TCCHS (a county school) to the Talladega *City* high school, which is funded and run by a different school board.[3]

---

[2] It is unclear whether the Parents also allege that the Board's decision to close TCCHS deprived them of their "constitutionally protected liberty to attend the school of their choice" in violation of the Equal Protection Clause. But if so, the court's analysis under its Procedural Due Process section applies equally here: The Parents do not have a constitutionally protected interest in sending their children to the public school of their choice.

[3] The Talladega *City* School System is separate and distinct from the Talladega County School System involved here. The city school system has a different Board of Education and Superintendent. So any allegations against the Talladega *City* School System have nothing to do with the School Defendants here.

In terms of opting out, Plaintiff Erika Cole (parent of a TCCHS student), testified that she knew of two white students that lived in the district zoned for TCCHS but attended high school in the Talladega City School System. But the School Defendants showed that Talladega City Schools have an open enrollment policy—allowing any student who wants to attend their schools to do so, regardless of race. So any student zoned for TCCHS had the option to enroll in the Talladega City School System rather than attend TCCHS. Race didn't matter.

In terms of opting in, the Parents say that students who wanted to attend TCCHS, but lived outside the district, were not allowed to enroll at TCCHS. Plaintiff Katrina Burk said she lives outside the district for TCCHS but wants her son to attend TCCHS because it provides smaller class sizes than other schools. The Parents argue that if the Board allowed out-of-district students to attend TCCHS, the school's enrollment numbers would easily be met. But the Parents failed to present evidence of any students (other than Burk's son) that live outside the district and want to attend TCCHS, and they failed to present evidence of any opt-in policy that would allow students to "save" TCCHS with the way the current district lines are drawn.[4]

But even if they did, the Parents have not shown a racially disparate impact or purpose. *Cook*, 573 F.3d at 1152. The Parents presented no evidence that white and black students were treated differently. Instead, the evidence suggested that no student, black or white, could attend TCCHS unless they lived in the district zoned for TCCHS. And the evidence showed that any student, black or white, could leave TCCHS and attend a Talladega City school because of that school system's open enrollment policy. In short, the Parents presented "no facts from which a racial motive for [their] treatment can be inferred." *Lambert v. Bd. of Trustees*, 793 F. App'x 938, 942 (11th Cir. 2019). Rather, organic factors other than race appear to have caused TCCHS's closure.

---

[4] As discussed below, school district lines were drawn to correspond to special tax districts.

The Parents also base their equal protection claim on allegations that the Board (predominantly white) drew districting lines to interfere with TCCHS (predominantly black) maintaining its necessary numbers to stay open. The Parents say the Board has a 60-year history of racial animus. (Doc. 1, p. 7, ¶ 29).

The Board says that district lines have not been changed because the lines are based on Alabama special tax districts. According to Deputy Superintendent Ozment, parents in four school districts (Childersburg, Lincoln, Munford, and Winterboro) voted for higher property taxes in their districts (with resulting funds from these taxes allocated to upgraded facilities and enhanced programming in schools), but the TCCHS district voted against the special tax increase. So if the Board redrew district lines, parents in special tax districts would pay the special tax but send their child to a non-special tax district (*i.e.*, TCCHS), and TCCHS students would attend schools in special tax districts without their parents having to pay the tax. Once the school came under priority status, Superintendent Lacey said she did not try to adjust district lines by adding students to the TCCHS district because 11% of students indicated they were leaving TCCHS under the school choice option. Lacey testified that even if she chose to expand district borders, because the state looks at attendance in arrears, the problem would persist because the school choice requirement would still be in place for at least three upcoming school years.

While the Parents have alleged violations of the Equal Protection Clause, they have presented no evidence to show that the Board's drawing of district lines, restrictions on students attending schools outside of their district, or the decision to ultimately close TCCHS had anything to do with race. On the contrary, Defendants showed nondiscriminatory reasons for their drawing of district lines, showed that students are treated equally in the requirement to attend schools within their zoned district, and showed that the decision to close TCCHS was not because of race but because of three factors: declining student enrollment, state accountability requirements, and the excessive financial burden—

brought to a head with TCCHS being named a priority school. The evidence shows that all races were treated equally in each decision the Board and Superintendent Lacey made. So the Parents have failed to carry their burden of showing that the School Defendants' decisions were motivated by a discriminatory purpose. *Cook*, 573 F.3d at 1152.

<u>42 U.S.C. § 1983 – Procedural Due Process</u>

"The Fourteenth Amendment prohibits any state from 'depriv[ing] any person of life, liberty, or property, without due process of law.' U.S. Const. amend. XIV, § 1. The most basic tenets of procedural due process are notice and an opportunity to be heard." *Dyer v. Atlanta Indep. Sch. Sys.*, 852 F. App'x 397, 402 (11th Cir. 2021) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). "A Section 1983 procedural due process claim requires a plaintiff to prove three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1266 (11th Cir. 2011) (citing *Grayden v. Rhodes,* 345 F.3d 1225, 1232 (11th Cir. 2003)).

First, the Parents fail to identify a constitutionally protected liberty interest of which they have been deprived. The Parents say their children have a constitutionally protected liberty interest in attending the school of their choice. To support this assertion, they cite *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012) for the proposition that a student has a constitutionally protected property interest in enrollment when the state's official regulations create a "legitimate claim of entitlement to remain enrolled." *Id.* at 1304. In *Barnes*, a student at a public institution was expelled after publicly opposing the school president's master plans for the campus. *Id.* at 1299-1301. The school's code of conduct and the Board's policy manual established that students could be punished if they violated the code of conduct. The court found that Barnes did not violate the code— so he had a legitimate claim of entitlement to remain enrolled at his school. *Id.* at 1304-05. But the decision in *Barnes* derives from the right to enrollment in *a* state school—not to choosing in which specific state

school to enroll. *Id.* at 1305 ("Indeed, no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in *a* state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment.") (emphasis added); *see Goss v. Lopez*, 419 U.S. 565, 574 (1975). Indeed, other circuits have explicitly identified this distinction. *See Mullen v. Thompson*, 31 F. App'x 77, 79 (3d Cir. 2002) ("Plaintiffs have no constitutionally cognizable property or liberty interest in attending the individual school of their choice."); *see also Seamons v. Snow*, 84 F.3d 1226, 1234-35 (10th Cir. 1996) (finding that the plaintiff did not have constitutional right to attend a *particular* school).

The Parents have not shown they have a constitutionally protected interest in sending their children to the public school of their choice, so they fail to show a deprivation of any such interest here. But even if they satisfied this first element, the Parents have not shown inadequate process. The Parents say that the Board did not hold a public hearing to discuss TCCHS closing, which violated Board procedure. (Doc. 1, p. 7, ¶ 32; Doc. 1, p. 23, ¶ 36). The court agrees with the Parents that neither the Superintendent nor Board members explicitly stated that closing TCCHS was on the table until the Board voted to close the school on April 2, 2024. And warning the Parents sooner may have been the wiser course.

But the School Defendants correctly argue that no rule or procedure *required* them to warn the Parents that closure was a possible outcome. In fact, as Superintendent Lacey's testimony revealed, there was no policy or procedure for closing a school in Talladega County. Nor had Superintendent Lacey or the Board ever closed a school before. So while earlier notice may have been preferable, the Parents cannot point to a specific process or procedure that the School Defendants failed to follow before the Board voted to close TCCHS.

Lacey also testified that she complied with the state's requirements for priority schools: She sent notices to parents about the new school choice requirement, offered opportunities for parents and students to tour

other schools, and had hearings to gather community input on the school choice options. And when the school choice forms came back, 11% of students indicated a plan to leave TCCHS. Although the Parents would have preferred Lacey tell them that the school might close earlier, nothing required her to do so. And as soon as the Board voted to close the school, Lacey informed parents of how to proceed with next steps.

—

In short, the School Defendants provided process for nearly four months before deciding to close the school, and they complied with all state requirements of school choice. Nothing more was required of them. So even if the Parents are correct that the School Defendants should have warned them sooner as a matter of courtesy, they cannot prove the School Defendants violated their rights as a matter of law.

### ii.    Superintendent Lacey – Individual Capacity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 733 (11th Cir. 2010). "An official asserting qualified immunity 'must first prove that he was acting within the scope of his discretionary authority.'" *Litaker v. Hoover Bd. of Educ.*, 277 F. Supp. 3d 1267, 1290 (N.D. Ala. 2017) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Then the burden shifts to the plaintiff to show that: "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing *Wilson v. Layne,* 526 U.S. 603, 609 (1999)).

The court finds that Lacey was acting within the scope of her discretionary authority when she recommended that the Board close TCCHS. When Lacey received notice of TCCHS's listing as a Priority School, she gathered input from parents on whether their students would

invoke the school choice options. When 11% said yes, Lacey testified that she evaluated the per-pupil expenditures of TCCHS compared to other schools in the county, in addition to additional funding that TCCHS required to stay open. Lacey testified that after evaluating the costs, along with the low enrollment numbers, TCCHS's priority status was a serious concern that she immediately brought to the Board.

The Parents must show that, in exercising these discretionary functions, Lacey violated a constitutional right, and that this right was clearly established at the time of the alleged violation. *Holloman*, 370 F.3d at 1264. The Parents have failed to do so because, as discussed above, they do not have a constitutionally protected liberty interest in sending their children to the public school of their choice. So Lacey is entitled to qualified immunity on these claims.

### iii.   Superintendent Lacey – Official Capacity

Lacey is not, however, subject to qualified immunity in her official capacity as Superintendent. That said, Lacey did not make the decision to close TCCHS, and she cannot reverse the Board's decision to do so. So the court finds that the Parents have failed to show a substantial likelihood of success on the merits against Superintendent Lacey for the same reasons they have failed to satisfy this element against the Board.

### B. State law claim

The Parents also argue that the School Defendants violated Alabama's Open Meetings Act ("OMA"). This is a state-law claim, meaning that the court must exercise supplemental jurisdiction to consider it.

Under 28 U.S.C. § 1367(a), <u>unless section 1367(b) or (c) applies</u>, the district court shall have supplemental jurisdiction over both additional claims and additional parties when those claims "are so related to claims in the action within [the] original jurisdiction [of the court] that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Section 1367(c) allows a federal court

to exercise some discretion in refusing to hear a case otherwise within its supplemental jurisdiction. *Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1563 (11th Cir. 1994).

Federalism concerns (*i.e.*, allowing state courts to decide state law) dictate this federal court decline supplemental jurisdiction over the Parents' state-law claim if the case moves forward and the Parents cannot plead or prove a viable claim under federal law.

For now, the court finds that regardless of whether it ultimately exercises supplemental jurisdiction over the Parents' state-law OMA claim, that claim does not warrant preliminary injunctive relief. The Alabama Open Meetings Act requires that all meetings of a governmental body be open to the public with prior notice. Ala. Code § 36-25A-1. The Parents allege that Superintendent Lacey and the Board voted to close the school without parental presence or input and failed to post public notice of the school's closure in time for parents to discuss the matter. (Doc. 1, p. 23, ¶ 34).

But the evidence shows otherwise. The Board held an open meeting on April 2, 2024, to discuss the school closing, with members of the public present. One member of the public, Stanley Garrett, "addressed the board on behalf of [TCCHS] students, parents, staff and alumni." (Doc. 1, p. 21). Further, the Friday *before* the April 2 meeting, "[o]ver 100 people turned out [] on the baseball field at Talladega County Central High School to show their support for keeping the school open in the face of declining enrollment and financial straits."[5] "Mary Wells, founder of the TCCHS Advisory Task Force and one of the keynote speakers, encouraged everyone present to turn out for a called meeting Tuesday of the Talladega County Board of Education." Other speakers encouraged everyone in attendance to "bring even more people to Tuesday's board meeting." *Id.*

---

[5] Chris Norwood, *TCCHS Supporters Urged to Attend County Board Meeting Today*, THE DAILY HOME (Apr. 2, 2024), https://www.annistonstar.com/the_daily_home/dh_news/tcchs-supporters-urged-to-attend-county-board-meeting-today/article_5c05fc38-f0ba-11ee-80fb-dfda86ea93a7.html.



Supporters of Talladega County Central High School gather at a rally Friday at the school's baseball field. Mary Wells, founder of the TCCHS Advisory Task Force and one of the keynote speakers, encouraged everyone present to turn out for a called meeting Tuesday of the Talladega County Board of Education. As it turns out, it was at that meeting where the vote to close the school was taken.

And three weeks before the April 2 meeting, Mary Wells was listed on the March 11, 2024 Agenda and Board Meeting Minutes under "Hear Requests/Statements from Groups and Recognitions." (Doc. 16-10, pp. 1-2). So the court finds that the Parents have failed to prove a substantial likelihood of success on the merits as to their state-law claim, should the court decide to exercise supplemental jurisdiction over it.

## C. The Parents' Motion for Judgment as a Matter of Law

After the hearing, the Parents moved for post-trial determinations and judgment as a matter of law based on the evidence presented at the hearing. (Doc. 17). In that motion, the Parents allege for the first time that the Board must present two public hearings regarding budget determinations under Ala. Code § 16-13-140.

The court will not grant judgment as a matter of law on this claim for two reasons. First, the court is unlikely to decide this claim. As discussed in Part A, the Parents failed to establish that the School Defendants have violated a constitutionally protected liberty interest, so they have failed to establish a substantial likelihood of success on the merits of a federal claim. As mentioned in Part B, the court is unlikely to exercise supplemental jurisdiction over a state-law claim under the Open Meetings Act if the Parents cannot plead or prove a viable federal claim. Put together, this means the court is unlikely to decide a claim that the School Defendants violated Ala. Code § 16-13-140 if the Parents amend their complaint to add this claim.

Second, even if the Parents add this claim and the court has jurisdiction to decide it, the court finds that the Parents are not presently entitled to judgment as a matter of law on the claim. First, there has been no discovery or presentation of evidence on the claim, so the court cannot know whether an essential fact question is disputed. Second, the court notes that the cited statute applies to hearings required "pertaining to [the Board's] proposed annual budget," Ala. Code § 16-13-140(c), not the Board's decision to close a school. There are no allegations in the complaint that the Board failed to hold the required budget meetings, and the court will not consider new allegations now.

## CONCLUSION

For the reasons stated within, the court **DENIES** the Parents' motion for a preliminary injunction. (Docs. 2, 3). The court also **DENIES** their post-hearing motion for judgment as a matter of law. (Doc. 17).

The Board has until on or before **July 17, 2024,** to answer or otherwise respond to the Parents' complaint.

**DONE** and **ORDERED** on June 25, 2024.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE